Todd Reed, plaintiff in *propria persona*
9420 Las Calabazillas Rd. NE
Albuquerque NM 87111
toddreed16@protonmail.com
(505) 604 8980

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

2023 JUL 13 PM 12: 02

CLERK-ALBUQUERQUE

## UNITED STATES DISTRICT COURT
## OF NEW MEXICO
### 333 Lomas Blvd NW, Alb. NM 87102

TODD REED

 PLAINTIFF

v.

NEW MEXICO SPORTS AND WELLNESS
MIKALA VARGUS
DEFENDANT

CV 23-589
CASE NO. _____

_____/

## **COMPLAINT FOR DISABILITY DISCRIMINATION**

Todd Reed ("plaintiff") sues New Mexico Sports and Wellness  ("defendant") for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12181-12189 ("Title III of the ADA") as implemented under 28 CFR Part 36 (36.101 *et sequitur*) for discrimination and retaliation on the basis of disability; for prohibited actions taken on the basis of this disability under the "regarded as" prong and the "record of" prong; and for declaratory and injunctive relief under Title III of the Americans with Disabilities Act as implemented under 28 CFR Part 36, *et sequitur*.

# I. PARTIES

**1.**     Plaintiff resides in Albuquerque, New Mexico at the address of 9420 Las Calabazillas NM Rd. for all times material to the facts giving rise to the complaint.

**2.**     At all times material to this action, plaintiff was an "invitee" of defendant within the meaning of the ADA.

3.     Defendant is a "public entity" within the definition of 28 CFR Part 35.104, with its principal place of business at 7120 Wyoming Blvd NE Ste 8B, Albuquerque NM 87109, for all times material to the facts giving rise to the complaint.

4.     At all times relevant, defendant was a "covered entity" as defined by 42 U.S.C. §§12181-12189.

## II. JURISDICTION AND VENUE

5.     This court has original and exclusive jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1345, in that the matters in controversy are brought pursuant to Title III of the ADA. This Court has authority to grant a declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202 and authority to grant equitable relief, monetary damages, and civil penalties under 42 U.S.C. § 12188 as implemented under 28 CFR Part 36 (36.101 *et sequitur*).

6.     Venue is proper in this judicial district under 28 U.S.C. §1391 because defendant does business in this judicial district and the acts complained of took place in this judicial district.

## III. PLAIN STATEMENT

7.     Defendant denied the plaintiff equal access to its facilities when he sought to exercise July 13, 2020.  The defendant refused to provide the access, and cancelled membership on August 23, 2021 for no other reason than plaintiff's refusal to submit to unrelated medical treatments as a condition for receiving the medical care she original sought.

## V. STATEMENTS OF FACT

8.     On July 13, 2021, plaintiff arrived at the entrance of defendant's NMSW on San Antonio building for his workout.

9.     Plaintiff was prevented from exercising by Mikayla Vargus, acting for the defendant, who began harassing him, demanding he have his temperature taken, and that he wear a medical device over his face or else he will lose his membership, putting a thermometer on his forehead, and telling him he must wear a surgical mask as if that was supposed to prevent the spread of a hypothetical "deadly contagious disease" (disability).

**10.**     Plaintiff explained that he had a very difficult time breathing with the surgical mask, and that demanding such an act violated his property rights.

**11.**     Plaintiff was told there were no exceptions and per the NMSW COVID-19 policies, he would not be allowed in without complying with these conditions.

**12.**     The so-called "Covid-19 policies" included nearly verbatim copies of those published by the Centers for Disease Control and Prevention, and the Department of Health, yet were not imposed upon anyone, including the plaintiff, by any court order or any law.

**13.**     The defendant's policy failed to include any provision for those with disabilities, and failed to identify any employee or designated individual who was responsible for responding to complaints for violations of the Americans with Disabilities Act.

**14.**     Plaintiff was forced to comply in order to exercise.

**15.**     When plaintiff was in the free weight room with Mikaela Vargas, he explained that if he were to wear a mask, he would have a difficult time breathing.

**16.**     Ms. Vargas told him that while the mask was an inconvenience, it was for everyone's safety, yet she failed to describe the medical necessity or medical efficacy of wearing a surgical mask, and she failed to provide any information that would allow the plaintiff to become informed as to the medical necessity or efficacy of participating in such a medical intervention.

**17.**     When plaintiff walked to the H.I.T room after being coerced into wearing a medical device on his face he began to work on the heavy bag, plaintiff, blacked out and found himself on the floor.

**18.**     Plaintiff regained consciousness and a young lady was asking if he was O.K.?  Plaintiff looked around the H.I.T. rooms and saw there was a NMSW trainer as well as others staring at him.

**19.**     NMSW trainer did not aid Plaintiff.  Plaintiff left the facility feeling unstable and woozy but made it to his vehicle to regain his strength.

**20.**    Plaintiff called NMSW and explained what happened.  The attendant on the phone asked if plaintiff had completed a report.  Plaintiff explained that the phone call was the report.

**21.**    Plaintiff asked if he would be able to workout without a medical device or any other mitigated factors.  The attendant explained that nobody could enter facility without their temperature being taken, or wearing a medical device.

**22.**    Plaintiff asked if he had been listed as a direct threat.  The Attendant did not understand and had to talk to a manager.

**23.**    The NMSW attendant took a report and said that there was nothing he could do to make the NMSW allow plaintiff inside.

**24.**    Plaintiff arrived at the gym several days later and asked Aaron the manager to please tell him the law that he was breaking by not wearing a mask.  Aaron was unable to explain any laws the supported NMSW stance, but that it was there policy.

**25.**    Plaintiff asked Aaron, the manager, how is it legal to force people to follow an unlawful policy.  Aaron was unable to answer, and that he could only follow their gym policy.

**26.**    Plaintiff was not allowed to enter the gym and work out for the day.

**27.**    Plaintiff was forced to put membership on hold.

**28.**    Plaintiff called every 3 months to request access membership

**29.**    On June 1, 2021 Plaintiff sent a notice of discrimination and slip and fall

**30.**    On July 4, 2021 Plaintiff sent a notice of discrimination and application concerning the ADA.

**31.**    On August 23, 2021 Plaintiff called NMSW to find out if he could begin working out. Mikaela Vargas returned phone call and left a message explaining that she was going to revoke my membership.

**32.**    On August 23, 2021 Plaintiff sent a letter to NMSW Administrators and Mikaela Vargus stating Ms. Vargas discriminatory behavior.

**33.**    On September 1, 2021 a second notice of discrimination was sent to NMSW administration and Ms. Vargas and Aaron Lavender.

**34.**    On February 24, 2021 a notice of discrimination and pre mediation was sent to NMSW Administration, Ms. Vargas and Aaron Lavender.

**35.**    All written communications and other mentioned documents, including video and voice messages will be added at a later date as Exhibits.

## VI. LEGAL STANDARDS

**36.**    Congress stated in 2008 that the main focus of the courts should be whether the employer is satisfying its obligations under the ADA. "...[I]t is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." The standards in Bell v. Twombly and Ashcroft v. Iqbal cannot be applied without consideration of Congressional intent for the ADA, especially since Congress had to amend the law in 2008 because this very Court had made decisions that countermanded the original intent of Congress and the law.

**37.**    The court is required to review the <u>defendant's response</u> to determine if it makes a cognizable defense under the ADA, and not solely to analyze the complaint to determine if it meets the pleading standards in "Bell" or "Ashcroft". The only sufficiently responses available to the defendant include whether or not it conducted any individualized assessment and determined that the plaintiff was a direct threat, or that plaintiff's refusal to participate in defendant's "Covid" policies had created an actual undue financial burden upon the defendant, or that plaintiff refusal did in fact fundamentally alter the defendant's normal business operations.

**38.**    One additional defense under the ADA includes the argument, based upon supporting facts, that the disability claimed by the plaintiff is both transitory and minor; however, plaintiff is not required to allege having any specific disability, nor was she required to allege the nature of any specific disability, nor did he make any such allegation; therefore, defendant cannot avail itself of this defense, even if it could satisfy both criteria, "transitory" and "minor".

**39.**    The court is advised that denying that the plaintiff had a disability is not a legal defense cognizable under the ADA.

**40.**    The court is further advised that citing a policy provision or "guideline" does not countermand any provision of the ADA, a federal law enacted by Congress and is therefore not a cognizable legal defense. Laws do not conflict with each other, and defendant's conduct was without any legal authority or duty.

**41.**    The court is further advised that, claiming there is a "pandemic" does not constitute any cognizable defense for the alleged violations of the ADA. Even if such a condition was proven to exist, it would not constitute a defense for the defendant's disability discrimination and retaliation.

**42.    Prohibition of discrimination on the basis of disability.** Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation. *28 CFR. § 36.201.*

**43.    Prohibition of retaliation on the basis of disability.** Title III of the ADA provides that "[n]o private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part". *28 CFR. § 36.206 (b).*

### VII. ARGUMENT

**I. DEFENDANT DISCRIMINATED PLAINTIFF ON THE BASIS OF DISABILITY**

**44.**    The defendant is a place of public accommodation.

**45.**     Defendant began adopting policies known collectively as its "Covid-19 policy" which included purported requirements that patients such as the plaintiff submit to unrelated medical treatments and examinations such as wearing surgical masks and disclosing unrelated medical records as a condition of entering the defendant's facility and obtaining treatment for the obvious medical condition of pregnancy.

**46.**    Plaintiff is regarded as having a disability and had given the defendant notice that she was regarded as having a disability.[1]

**47.**    Plaintiff was not required to disclose the identity of anyone regarding her as having a disability.

**48.**    It is not relevant whether or not the defendant regarded the plaintiff as having a disability.

**49.**    The plaintiff never requested any accommodation or modification to the defendant's "Covid" policy,  nor was she required to make any such request.

**50.**    Plaintiff is not challenging defendant's failure to provide reasonable modifications under 28 CFR Part 36.302.  Likewise, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.

**51.**    Defendant's denial of regarding the plaintiff as having a disability is not relevant and does not constitute a legal defense that is cognizable under the Americans with Disabilities Act.

**52.**    Plaintiff was denied services and was denied equal access to services offered by the defendant.

**53.**    Upon invoking her rights under the ADA by giving notice that she was regarded as having a disability, the plaintiff exercise her right to refuse unrelated medical treatments and her rights to informed consent and her rights to medical privacy, each of which are squarely rooted in Title III of the ADA as implemented under 28 CFR Parts 36.105(b)(1) and c(1).

**54.**    The defendant's "Covid" policy was disproportionately applied to those with disabilities and then the group of people without disabilities, and then completely ignored those within

---

[1] 28 CFR Part 36.105(f)

the protected class of individuals having given notice of being regarded as having a disability within the meaning of the Americans with Disabilities Act.

**55.**    The defendant admits that its so-called "Covid" policy was intended to "prevent the spread of Covid" and the policy itself demonstrates that the defendant mis-classified the plaintiff as having a disability2 known as "Covid-19", even though the plaintiff never claimed to have any specific disability, nor was she required to claim to have any actual disability.

**56.**    The defendant denied the plaintiff equal access to its programs, services and benefits in violation of Title III of the Americans with Disabilities Act.

**57.**    The defendant admits that its "Covid-19 policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease; however, the defendant failed to conduct any individualized assessment of the plaintiff to determine if she was infected with any contagious disease or disability, yet involuntarily sought to impose its "Covid" policy upon her as if she had such a disability.

**58.**    The defendant's so-called "Covid" policy was based upon the pure speculation and hypothetical belief that the plaintiff had a deadly contagious disease and then defendant disingenuously denies this.

**59.**    While defendant's "Covid" policy's stated purpose is to "prevent the spread of Covid", it has no mechanism by which to measure such results, and on its face, assumes that the treatments in the policy have little or no medical efficacy unless everyone submits to them, and continues submitting to them within no certain time limit.  This is the very definition of a policy which has no medical necessary or medical efficacy.  At no time in human history has it ever been established, by any scientific finding, that in order for one person to be protected from a contagious disease, that another person has to submit to a medical treatment.  There has never been any science establishing that two people are required to make a medical treatment effective, and even if this were true, then the medical treatment would not be effective.

---

2,  28 CFR Part 36.105(e)(1)

**60.**    The policy rests on the hypothetical speculation that every invitee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its patients and visitors are simultaneously at risk and pose a risk to the health of all other visitors, yet without any *bona fide* medical diagnosis. Medical professionals should know better.

**61.**    No provisions of defendant's policy are intended to establish through individualized assessment whether a particular invitee poses any direct threat to the health of the rest of the defendant's invitees; instead, it is based upon the ridiculous assumption that everyone has such a disease.

**62.**    The defendant's "Covid-19 policy" imposed these measures differently upon different groups of its invitees, employees and patrons without considering the individualized medical assessment of each invitee's health or whether the policies were appropriate for any specific individual.

**63.**    Likewise, no provisions are in place which authorize or impose the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is voluntary.

**64.**    In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism.

**65.**    The policy thus relies upon the voluntary compliance of patients and invitees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-required medical inquiries or treatments.

**66.**    It should also be noted that defendant's "Covid" policy was disproportionately applied against patrons who did not volunteer to waive their rights and who claimed their medical privacy rights

**67.**    The policy thus failed to acknowledge individuals who claimed their rights under disability law and therefore were not subject to the policy or to the same requirements as the rest of the invitees.  Once again, the defendant's "Covid-19 policy" made no provisions for those with disabilities.

**68.**    The defendant's "Covid" policy failed to include or offer any reasonable modifications to its "Covid" policy that would be cognizable under Title III of the ADA, specifically, 28 CFR Part 36.302.

**69.**    The policy also asked representatives of the defendant to make repeated, non-required-related medical inquiries of patrons and to impose unreasonable medical treatments on them, such as mask-wearing and testing.

**70.**    The policy, as mentioned previously, lacked enforce-ability, and rather than allow patrons to make their own medical decisions, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "un-vaccinated" patrons, such as the plaintiff.

**71.**    When the plaintiff, as a qualified individual, exercised her right under the ADA to refuse the medical treatments imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against her by perceiving her as having an un-diagnosed disability, the defendant denied her equal access to its programs, services and benefits and continued to impose these medical procedures that were unrelated to any medical condition of the plaintiff.

**72.**    The defendant also retaliated against the plaintiff by interfering with her rights, imposing punitive measures including denying her services and benefits plaintiff had already paid for and barring her from receiving any of defendant's services, forever.  These penalties were imposed as a direct and proximate cause of plaintiff's good faith refusal to participate in the defendant's "Covid" policy.

**A. PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA.**

**73.**    It should be noted that the ADA directs courts to construe "disability" in "favor of broad coverage of individuals" to the "maximum extent permitted by the terms" of the statute. *28 CFR §36.105(2)(i)*. Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one.

**74.**    The defendant's "Covid-19 policy" openly claims that it is intended to "prevent the spread of Covid-19", which it claims is a deadly contagious disease, and then outrageously, acts as if everyone is infected with it, and if everyone must submit to the same exact medical treatments without any professional examination, diagnosis, supervision, or judicial approval or oversight.

**(1) Defendant's perception of plaintiff having disability.**

**75.**     Based on its "Covid-19 policy", the defendant's perception was that the plaintiff actually had a contagious disease or else, a compromised immune system that made her prone to contracting a contagious disease.  Denying this is not relevant and not a defense.  The fact that plaintiff was regarded as having a disability and so advised the defendant imposed a legal duty upon the defendant to comply with the ADA, whether or not it admitted or denied regarding plaintiff as having a disability.

**76.**     The mere perception that the plaintiff had a compromised immune system (independently if the plaintiff was infected with a contagious disease) was sufficient for defendant to consider that plaintiff has an impairment that substantially limited her ability to attend her medical appointments and receive care as she was giving birth, a major life activity. The defendant imposed this condition upon the plaintiff without conducting an individualized assessment to determine she was a direct threat.

**77.**     At all times material to this action, defendant failed to comply with its duty under Title III of the ADA once plaintiff validly notified defendant of the plaintiff being regarded as disabled and substantially limited and requested equal participation and access under the ADA.

**78.**     Plaintiff advised the defendant that she was perceived by defendant's policies and procedures as being disabled with a contagious disease and substantially limited by an impaired immune system and an impaired respiratory system to such an extent that the defendant refused to allow plaintiff to participate in and have access to, at the time of the incident and in the future, all goods and services unless plaintiff used mitigation measures.

**(2) Failure to conduct an individualized assessment.**

**79.**     Upon receiving notice of the plaintiff's disability, defendant made no attempt to perform the required individualized assessment that is required prior to treating the plaintiff as a direct threat.

**80.**     Defendant ignored the requirement and continued to demand that the plaintiff participate in its "health control measures" or accommodations such as mask-wearing, medical examinations, inquiries and treatments which are all under Emergency Use Authorization ("EUA") and may be refused.

**81.**    The defendant simply denied that the plaintiff was regarded as having a disability, without any assessment of any kind, and then denied that the plaintiff was a qualified individual with a disability, again, without any assessment of any kind.

**(3) Failure to include provisions for invitee's with disabilities.**

**82.**    Moreover, defendant's policy, which does in fact demonstrate that it certainly did regard the plaintiff as having "Covid-19", a disability that is covered by the ADA, illegally failed to include any provision for those with disabilities.

**83.**    The policy failed to provide any advice or instruction on how to conduct any individualized assessment for those invitees claiming rights under the ADA, and failed to identify any ADA representative of the defendant. In fact, the defendant's "Covid-19 policy" completely ignored its legal duties to aid and encourage those with disabilities under the ADA.

**B. THE DEFENDANT IS A PLACE OF PUBLIC ACCOMMODATION**

**84.**    The defendant is a covered entity and place of public accommodation.

**C. DEFENDANT INVOLUNTARILY IMPOSED MEDICAL TREATMENTS ON PLAINTIFF AS A CONDITION TO RECEIVE UNRELATED MEDICAL CARE**

**(1) Denial of services on the basis of disabilities.**

**85.**    Defendant discriminated and retaliated against plaintiff for making a complaint that he was being regarded as disabled, thus asserting her entitlement to equal participation and access under the ADA.

**86.**    Upon advising the defendant that the plaintiff was regarded as having a disability; that he was a qualified individual with a disability; and he was not subject to the defendant's "Covid-19 policy" under 28 CFR Part 35.130(e)(1), the plaintiff exercised his right to refuse the offered medical treatment of wearing a surgical mask.

**87.**    The defendant stated that the purpose and intent of the policy was to "prevent the spread of Covid-19" and this policy was predicated on the false and unproven presumption and all patients and invitees of the defendant had "Covid-19".

**88.**    The defendant informed the plaintiff that the policy was a condition of being allowed inside the NMSW facility premises to exercise as he has always done.

**89.**    The defendant denied the plaintiff equal access to its programs, services and benefits based upon disability in violation of 28 CFR Part 35.130(a).

**90.**    Defendant employed its policies and procedures to harass, limit, classify, deny the plaintiff equal access to the services it made available to other patients without disabilities.

**91.**    Defendant's "COVID-19 policies and procedures" classified the plaintiff as "substantially impaired" such that defendant would not permit plaintiff equal access and medical care without first submitting to the defendant's accommodations ("mitigation measures").

**92.**    However, plaintiff duly noticed the defendant of her good faith opposition to defendant's discriminatory policies and procedures.

**93.**    Plaintiff is not required to accept or participate in medical treatments, especially those not related to any medical care he required; nevertheless, defendant used harassment as a technique to impose "mitigation measures", to treat him for a disease or disability he did not have and upon him for a perceived and unproven disability, even after plaintiff clearly stated he was excluded from the policy due to invoking his rights under the ADA.

**94.**    Defendant's policy and procedures interfered with plaintiff's right to invoke ADA protections by refusing to recognize that plaintiff is entitled to claim exclusion under Federal law to the policy and procedures.

**95.**    Defendant failed or refused to satisfy its legal duties under the ADA to aid and encourage those with disabilities, specifically, in response to the plaintiff giving notice that he was regarded as having a disability.

**96.**    Instead, the defendant proceeded to mis-classify the plaintiff as having a disability, the cure or treatment for which was its "Covid" policy.

**(2) Plaintiff was protected under the ADA.**

**97.**    Title III of the ADA also protects individuals such as the plaintiff for whom submitting to certain accommodation measures would create impairments.

**98.**    In this case, plaintiff had informed defendant's representatives that he had a the right of informed consent that prevented him from wearing a mask or a face shield.

**99.**    Defendant's refusal to honor plaintiff's legal exclusion from the policy of using medical devices for mitigation measures (masks) creates impairments for the plaintiff that she never had to ameliorate prior to defendant regarding his as disabled with a contagious disease.

**100.**    The fact that the defendant claims to have applied its "mask-wearing" policy to everyone equally, fails to recognize the fact that the plaintiff, after giving notice of having a disability, was within a protected class and engaged in a protected activity and therefore, not subject to the same "Covid-19 policy". This is the same as in the example of defendant requiring a wheelchair bound veteran to use the stairs or face denial of care by the analogy: *Everyone was required to use the stairs and the policy is applied equally to everyone*, is the erroneous conclusion here.

**101.**    As well, under Title III of the ADA, the defendant, a public accommodation, may not require the plaintiff, an individual with a disability, or who gave notice of being regarded as having a disability,  and for which defendant mis-classified as having a disability, to accept accommodations which the plaintiff chose not to accept, without violating 28 CFR 36.203(c)(1).

**(3) Defendant failed to obtain exclusion from its legal duties under the ADA**

**102.**    ADA compliance requires the defendant to either provide equal access and participation or to claim and prove an exemption to Title III of the ADA; defendant did neither and thus failed to maintain compliance with Title III of the ADA.

**103.**    The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid" policy would have created any undue financial hardship.

**104.**    The defendant failed to identify or describe any set of facts establishing that the disability its "Covid-19 policy" was intended to prevent was <u>both</u> transitory <u>and</u> minor.  No such facts could ever be established because the defendant had no medical diagnosis of the plaintiff and failed to conduct any individualized assessment.

145.    Not only is the defendant's "Covid-19 policy" irrational and the <u>implausible scenario that everyone including the plaintiff had a deadly contagious disease, but that the defendant</u>

could treat it without permission, without any medical diagnosis and without any means of measuring the results to determine if its treatment was effective.

146.   Defendant's policy it is based upon the purely speculative and hypothetical belief that everyone suddenly incurred the same disability and that magically, the defendant had the treatment and could impose it upon everyone without any medical examination, informed consent, medical privacy, diagnosis or professional or judicial oversight.

146.   The policy was not implemented with any legal authority or duty whatsoever, there is no rational basis to act as if every single patron suddenly had the same exact illness (disability) and that without any examination, everyone would benefit from the same exact medical treatment and that non-skilled and unlicensed individuals should impose such interventions upon everyone at the same time because of some commentary on a website (e.g. the CDC) that says it is a good idea, while such websites simultaneously disclaim such commentary as having any legal or medical accuracy.

**105.**   Defendant had no financial responsibility, either to protect anyone from any deadly contagious disease, or to compensate anyone suffering any adverse health consequences from participating in its "Covid" policy.

**106.**   This practice, regarding oneself and others as having an illness without any diagnosis, and then seeking to treat everyone with the same medical intervention without any diagnosis, is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health.

**107.**   The defendant's "Covid-19 policy" demonstrates that those seeking to impose it upon invitees such as the plaintiff are suffering from an un-diagnosed mental illness and have demonstrated that each of them are a danger to themselves and others and must be ordered to submit to an involuntary mental evaluation.

**II. DEFENDANT RETALIATED PLAINTIFF ON THE BASIS OF DISABILITY**

**A. Plaintiff was engaged in protected activity.**

**108.**   Upon giving defendant notice that he was regarded as having a disability and that he was a qualified individual with a disability, the plaintiff became protected under the ADA.

**109.**    Defendant discriminated and retaliated against plaintiff for making a complaint that he was being regarded as disabled, thus asserting his entitlement to equal participation and access under the ADA.

**110.**    Despite having knowledge of plaintiff claiming protected status under the ADA, defendant has discriminated and continues to discriminate against the plaintiff, an individual with disabilities, on the basis of disability in the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations, 42 U.S.C. §12182(a).

**B. Plaintiff was subjected to adverse employment actions.**

**111.**    The defendant began retaliating against the plaintiff by imposing punitive measures upon plaintiff for his good faith refusal to participate in the defendant's offered accommodations as previously alleged.

**112.**    Defendant refused plaintiff to attend his regular exercise activities, and was coerced into wearing a medical device causing plaintiff to black out, in which defendant's employee offered no assistance.

**113.**    The defendant's responses to the requests made by the plaintiff to cease the discrimination and harassment were in fact non-responsive, dismissive or harassing.

**114.**    The defendant began unceasingly retaliating against the plaintiff despite plaintiff's reasonable good faith belief that he was exercising protected opposition to discriminatory activities and claiming rights protected under the ADA.

**115.**    The injury suffered by the plaintiff is thereby concrete and particularized and it is actual and imminent.

**116.**    The injury alleged in the complaint, including the pleading and affidavit clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical. The injury described therein is traceable to the challenged action, conduct and policies of the defendant.

**117.**    The harm (injury) already suffered by the plaintiff includes, but is not limited to, having to choose between waiving rights to: medical privacy, informed consent, refusal to take part in clinical trials, and to be free of discrimination and retaliation, and blacking out due to the force of medical treatment from non medical personnel.  Once violated, these rights cannot be recovered.

**118.**    As a result of defendant's actions, the plaintiff has experienced retaliation, coercion, and interference with her rights which are violations of 28 CFR 36.206 (a)(b) and (c).

**119.**    As a result of defendant's intentional, willful and unlawful acts by interfering with her rights under the ADA, plaintiff has suffered injury and damages.

**120.**    The defendant retaliated against the plaintiff by interfering with the exercise or enjoyment of rights granted or protected by Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008, specifically 28 CFR Part 36.206(c).

**C. There is a causal connection between the protected activity and the adverse actions.**

**121.**    Each time the plaintiff exercised her right to refuse treatment, defendant undertook adverse actions against the plaintiff and in each instance, such measures were causally related to the incident of denying the plaintiff equal access as alleged.

**122.**    The defendant has focused all of its efforts on punishing the plaintiff for claiming his rights and for opposing a discriminatory policy; rather than to providing equal access and participation, per defendant's duty.

**123.**    Defendant has established a pattern of practicing retaliation against the plaintiff which is not objectively or subjectively in good faith, therefore plaintiff is entitled to liquidated damages or other monetary damages, including punitive damages to the extent available.

**124.**    Plaintiff demands a jury trial.

        **WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount he is found to be entitled; (iii) an award of costs and reasonable court fees; and (iv) punitive damages to the extent available; (v) pre-judgment and post-judgment interest; and (vi) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

### COMPLAINT FOR NEGLIGENCE

        The plaintiff Todd Reed sues the defendant New Mexico Sports and Wellness, hereafter "NMSW", for negligence and alleges the following:

### JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to the New Mexico Tort Claims Act for allegations of negligence NM Stat. § 41-4-1 *et. seq.*(2020) NM Code R. § 16.23.17.9. Venue is proper as both the plaintiff and defendant reside or conduct business within Albuquerque New Mexico.

The plaintiff resided in Albuquerque New Mexico, for all times material to this complaint, and designates the mailing address of 9420 Las Calabazillas Rd. NE, Albuquerque New Mexico 87111 to which all written communications can be delivered.

The defendant has a business in Albuquerque New Mexico and an employer doing business at the address of 7120 Wyoming Blvd. NE Ste 8B, Albuquerque NM 87109 for all times material to this complaint.  Defendant's President is Ed Williams whose business address is 6140 Greenwood Plaza Blvd. Greenwood Village Co. 80111

The plaintiff did not become aware that he was able to state a cause of action for negligence against the defendant until recently, or within the last few months of commencing this complaint against the defendant.

The defendant has no immunity from this cause of action, or any immunity has been waived.

### PLAIN STATEMENT

Defendant implemented a policy known as its "Covid" policy that had nothing to do with plaintiff's time as a patient with defendant.  Despite this, defendant sought to impose experimental medical interventions upon the plaintiff without any *bona fide* medical examination or diagnosis, medical necessity, legal authority or legal duty.  The defendant claimed that the policy was intended to prevent the spread of what it believed to be a "deadly contagious disease" known as "Covid-19"; however, the defendant never had any means of measuring or determining whether or not its policy was effective.  Additionally, the policy sought to circumvent the plaintiff's medical privacy rights and rights to informed consent, while also imposing experimental medical treatments administered by laymen and without the supervision of any qualified physician, and without any *bona fide* medical diagnosis, and without any judicial oversight or approval.

As a direct and proximate cause of defendant's negligent policy and the manner in which the employees of defendant imposed it upon the plaintiff, the plaintiff suffered substantial financial losses and severe adverse health consequences which continue to this day.

## STATEMENTS OF FACT

The defendant was a public accommodation from which plaintiff sought to continue his exercise routine July 13, 2020.

The plaintiff re-alleges his allegations from lines or paragraphs 8 through 76 for Counts I and II (pages 2 through 9) in the foregoing complaint and makes the following additional allegations.

## ALLEGATIONS

Plaintiff re-alleges the foregoing statements of fact from Counts I and Counts II and incorporates each fact herein and further alleges as follows.

There was never any "mandate" because it was not only negligent, it never created any new legal duty for anyone to comply, nor any new legal authority for anyone, except the Department of Health, to impose any experimental medical treatments on anyone. It was negligent because it was based upon the ludicrous premise that "one person needs to undertake a medical treatment in order to prevent illness in another person". If this were true, then the population of people on Earth and possibly all mammalian life would have become extinct thousands of years ago. If a medical treatment is effective, then one person could take it and be treated or cured. The so-called "mandate" admits on its face, by its very existence, that the medical treatments are not effective in any way whatsoever. Again, the so-called "mandate" created no legal duty or authority and not was legally binding upon anyone. The "mandate" is no more binding upon anyone than would be a movie script would be binding upon extras near a movie set. At the very least, the "mandate" failed to consider those with disabilities and failed to comply with the ADA and in fact, facilitated discrimination and retaliation by all those employers gullible enough to participate as if the "mandate" were anything more than a movie script.

If two people are required to make a medical treatment effective, then it is not effective, at all.  Especially for employees of the defendant who are doctors and nurses and generally scientists, they each have a greater expectation of knowledge by their professional and educational backgrounds.

The defendant adopted a policy known as its "Covid-19" policy, which was published on its website at this page: https://wellbridge.com/sports-and-wellness-del-norte/.  It is likely that by the time this allegation is discovered by the defendant, the defendant will have attempted to remove such pages from its website.

The plaintiff alleges each and every provision of this policy and incorporates each said provision into this complaint.

The plaintiff alleges the defendant's illegal covid policy was implemented by the staff as to be shown in video, and phone messages.

The plaintiff requests that this court take judicial notice of every aspect and term of the State of New Mexicio's "Covid" policy, https://www.governor.state.nm.us/2021/08/17/new-mexico-to-re-implement-indoor-mask-mandate-vaccinations-required-in-hospitals-congregate-settings/ including and even revision of the policy and the state's current "Covid" policy now published at https://cv.nmhealth.org/.

The plaintiff requests that this court take judicial notice of defendant's employee policy published in its employee handbook, as well as membership contract violates ADA law and is discriminatory

The adoption and implementation of defendant's "Covid" policy was negligent.

In spite of the vaccine manufacturers such as Pfizer, GlaxoSmithKline, Inovio Pharmaceuticals, Johnson & Johnson, Novavax Inc, Moderna, Sanofi, Heat Biologics, BioNTech, Vir Biotechnology, Vaxart, Moderna Therapeutics, Emergent BioSolutions, Dynavax, Geovax and Curvac each disclaiming all liability for their experimental vaccines during an emergency use authorization period, and the fact that the United States indemnified each and every one of these pharmaceutical companies for their so-called "vaccines" (which are not vaccines at all) and in spite of the announcement by the departments of health that

these clinical trial experimental vaccines do not prevent transmission or infection of any disease, specifically the so-called "Covid-19 disease", the defendant was somehow and miraculously able to claim that its policy was able to "prevent the spread of Covid". This claim contradicts every authority in the health care industry and is based upon the false promise that defendant suddenly acquired the ability to treat or prevent the infection or transmission of a so-called "deadly contagious disease", when every other expert in the world admitted that it could not. This is not only delusional, but negligent.

The provision of Defendant's so-called "Covid" policy admits that defendant sought to impose experimental medical treatments, that is, mask-wearing and a "vaccine" during an emergency use authorization (EUA) period, without any medical diagnosis or informed consent. The fact that such a "vaccine" require a "booster" demonstrates that the medical treatment has no medical efficacy or not enough to prevent infection or transmission of the so-called "Covid-19", even if there were evidence that such a disease did exist.

The defendant owed the plaintiff the duty of complying with, or upholding the plaintiff's medical privacy rights and rights to informed consent.

The defendant owed the plaintiff the duties normally associated with public accommodations, such as hospitals.

The policy is based upon the implausible speculation and hypothetical belief that every employee of the defendant, and the plaintiff, suddenly became infected, or would soon become infected, with the same exact disease and that this disease is a deadly contagious disease. This belief is of course based upon the unproven belief that viruses are contagious pathogens and that "Covid-19" is a deadly contagious pathogen, and that every employee, or every person in the country suddenly became infected with such disease, or would imminently become infected.

The policy is also based upon the pure speculation and hypothetical belief that defendant suddenly acquired the legal authority and the legal duty to involuntarily impose such experimental medical treatments upon its employees and the plaintiff as a new condition of invitees such as the defendant.

The policy is also based upon the purely speculative and hypothetical belief that the defendant suddenly obtained the legal right and the legal duty to violate every patient's or invitees rights to medical privacy and informed consent without any judicial oversight or approval.

The policy is also based upon the purely speculative and hypothetical belief that the defendant suddenly acquired the professional competence and qualifications to determine that these medical treatments and other procedures were medically necessary without the supervision of any *bona fide* and licensed physician.

The defendant owed the plaintiff the duty of fulfilling its professional obligations where the defendant's so-called "Covid" policy was not relevant to the care sought by the plaintiff, that is, the birth of her child.

The defendant claims that its "Covid" policy was intended to "prevent the spread of Covid"; however, defendant had no reliable means of measuring or determining when and where anyone became infected with such a disease, or if anyone had become infected with such a disease, and it had no means of excluding other factors not related to defendant's "Covid" policy that may have contributed to any such infection.  At no time was any employee or invitee in a controlled environment that would have enabled the defendant to conclusively establish the proximate cause of anyone becoming infected with the so-called "Covid-19" disease.  The defendant, nor its  "Covid" policy, had no way of determining the proximate cause of anyone becoming infected with such a disease and it cannot therefore, legitimately "prevent the spread of Covid", no matter what its policies, even if such a disease did exist.  For this reason alone, the defendant's policy was not only foolish and ignorant, but negligent.

The defendant's policy was also negligent because the very provisions of the policy demonstrate that not one provision or medical treatment was expected to prevent, treat or cure any illness, especially the so-called "Covid-19" disease.  The stated purpose for the policy was to "prevent the spread of Covid", but the treatments stated in the policy admittedly did not prevent the spread of "Covid" unless everyone undertook the treatments in order to prevent illness in another employee.  The policy is premised upon the ludicrous idea that its treatments and procedures required at least two people to participate in order to be effective; this is clearly set forth in the policy which stated that it applied to everyone, not just employees

or patients or invitees who believed they were at risk of infection. There has never been any scientific proof, at any time in human history, that in order for a medical treatment to be effective, one person has to undergo the treatment in order to prevent illness in another person. There is absolutely no science, anywhere in the world, demonstrating that two people are required in order for a medical treatment to be effective. Acting as if this were true is the stuff of Bugs Bunny cartoons and Hollywood movies. Even if it were true, this would establish that the treatment has <u>zero medical efficacy</u>.

Furthermore, defendant's negligent policy is also based on the foolish idea that even if someone participated in it, he would need to continue participating in it, even after treatment, and even if everyone around him had already been treated. This has to be the most idiotic medical treatment plan in all of human history, and therefore, negligent.

The defendant owed a duty to the plaintiff to comply with both state and federal laws, especially for hospitals. The defendant breached one or more of its duties to the plaintiff as more fully set forth and alleged herein.

<u>The state's public health policy</u>,[3] especially involving contagious diseases and deadly contagious diseases that lead to epidemics and pandemics, including but not limited to, those involving respiratory illness, <u>requires judicial oversight upon petition to the court which can only be made by the department of health, and such petition must be based upon a physician's</u> <u>*bona fide* diagnosis and affidavit that the specific individual is an imminent threat to himself</u> <u>or others</u>. The court may then promulgate an order imposing certain medical interventions upon the specific individual, following an evidentiary hearing that determined he posed an imminent threat to himself or others. This is an actual "mandate", a legal duty, to which only the department of health is subject and to which only the department of health can avail itself. This legal authority, and this legal duty, cannot be delegated and certainly, the defendant had no such legal duty nor legal authority to impose, not only medical treatments, but involuntary and experimental medical treatments during an emergency use authorization period.

---

[3]  Health & Safety Code, Sections 121365 & 121367

In fact, it was this very conduct by the Nazis in Germany that resulted in the Nuremberg Code,[4] a body if medical and ethical standards prohibiting any nation from imposing medical treatments on its population in violation of medical privacy and rights to informed consent. The Nuremberg Code eventually found its way into the federal laws of the United States and its Food and Drug Administration and is now memorialized in every states' public health policy by the concepts known as "rights to informed consent" and "medical privacy".

The defendant deliberately provided the plaintiff with false information, claiming that there was some law requiring her compliance with its "Covid" policy, specifically, defendant cited Health & Safety Code 120175.  This citation is false because its fails to identify the existence of any contagious disease as required by Code 120215 and the defendant failed to obtain any *bona fide* health order from an actual court based upon actual evidence as required by the sections referenced in note 5.

These regulations create no new legal duty nor legal authority for the defendant's policy.  This regulation depends solely upon voluntary participation because, assuming it is legally binding at all, it fails to include any provision requiring anyone to actually disclose his medical records so that compliance could be verified.  Assuming that the regulation is legally binding upon its face, it fails to include any provision requiring anyone, including the plaintiff, to disclose her medical history or vital statistics, so there is no possible way to impose the regulation upon anyone who chooses to exercise his medical privacy rights.

It is quite obvious that if the defendant had the authority to compel the plaintiff's disclosure of her medical records and vital statistics, then the defendant could have simply requested these records from plaintiff's physician and avoided all of the drama.  Instead, defendant's policy was negligently based upon coercing and intimidating the plaintiff to waive her medical privacy rights, or simply penalize her for exercising these rights, by the manner in which it was imposed upon her by the defendant.

The defendant's refusal to treat the plaintiff unless she submitted to an unrelated medical treatment without any diagnosis and without her consent was the direct and proximate cause of defendant's implementation of a policy known as its "Covid" policy that

---

[4]  United States of America v. Karl Brandt, Military Tribunal I, est. on 25 October 1946 under General Orders No. 68 issued by command of the United States Military Government for Germany

sought to involuntarily and negligently impose experimental medical treatments upon the plaintiff.

The defendant's "Covid" policy sought to impose experimental medical treatments known as defendant's "Covid" policy upon the plaintiff, such that the plaintiff was required to submit to such medical treatment, for which the consequences included denial of medical treatment for which there had already been a *bona fide* medical diagnosis (she was obviously pregnant).

The defendant's policy never identified any "vaccine" that was not an experimental medical treatment or outside the Food and Drug Administration's Emergency Use Authorization period; otherwise, not a clinical trial or epidemiological experiment.

The defendant's "Covid" policy was not based upon any *bona fide* medical diagnosis of the plaintiff, nor did it include any legal duty for the plaintiff to disclosure her medical records for the treatments which were unrelated to her pregnancy.

Likewise, defendant's "Covid" policy was not based upon any new legal authority giving the defendant the legal right to impose any provision of its "Covid" policy upon the plaintiff as a condition for an unrelated medical treatment.

The plaintiff directed the defendant to obtain any needed medical records from the plaintiff's physician but the defendant failed to request or obtain such medical records from the plaintiff's physician because of the plaintiff's medical privacy rights. The defendant's "Covid" policy sought to require the plaintiff to waive these rights by asking for her medical records directly, instead of requesting them from her physician. The fact that the defendant failed to, and would not have been able to obtain such records from plaintiff's physician due to her medical privacy rights, establishes that the defendant's policy did not overcome or constitute any waiver of the plaintiff's medical privacy rights with any new legal duty or any new legal authority.

These new conditions, in defendant's "Covid" policy, were not subject to any supervision by a competent or qualified medical professional, such as a physician, failed to consider or provide protections for plaintiff rights to medical privacy or informed consent, and

were not the result of any new legal duty or legal authority or court order, or court order obtained by the Department of Health.

All material acts and conduct took place upon the premises of the defendant at the location alleged, the date alleged and at the approximate time alleged.

The plaintiff did not contribute to the defendant's acts or conduct giving rise to this complaint.

The plaintiff suffered injury as a direct and proximate consequence of the defendant's actions or conduct that, at the very least fell below its standard of care as a direct and proximate cause of the defendant implementing its so-called "Covid" policy. These material facts and events took place between the dates of 7/13/2020 and 2/24/2021.

The defendant and its employees were in control of the premises and solely responsible for the condition of the premises and the conduct alleged, for all times material to this complaint.

In fact, the defendant adopted a policy that deliberately violated its duty of care by any reasonable standard, as more fully alleged herein, including but not limited to those described by the following allegations. The defendant's so-called "Covid" policy was unsafe and involved imposing involuntary and experimental medical treatments that admittedly had no medical efficacy (because it relied upon one person being treated in order to prevent illness in another).

The plaintiff alleges each and every provision and revision of its "Covid" policy and summarizes the material provisions by the following:

The defendant's "Covid" policy purportedly required plaintiff to submit to medical examinations known as "Covid tests", whether or not such test results were obtained by any licensed physician, or the consent of the plaintiff.

The defendant's policy then required the plaintiff to disclose the test results, medical records, not to any physician, and not to the plaintiff's own physician, but to complete layman or another employee with absolutely no medical professional obligations to the plaintiff (i.e., someone who was not accountable as would be plaintiff's actual physician).

Instead of requesting the plaintiff's medical records from the plaintiff's physician, knowing that plaintiff's physician would correctly refuse without the express written consent of the plaintiff, the defendant circumvented or attempted to circumvent this by coercing the plaintiff to waive her medical privacy rights to implementing its ridiculous "Covid" policy directly upon the plaintiff, and in the manner more fully described in this complaint.

The defendant's "Covid" policy purportedly required plaintiff to disclose her medical records to complete laymen with no medical training or expertise, referring to such condition as disclosing the plaintiff's "vaccine status" along with the results of these "Covid" tests.

The defendant's "Covid" policy imposed terms of segregation, isolation and quarantine without any judicial oversight.

The defendant's "Covid" policy failed to include any notice that its provisions were implemented during an official "emergency use authorization" or (EUA) period and that any medical treatments were experimental and not approved by the Food and Drug Administration (FDA).

The defendant's "Covid" policy purportedly required plaintiff to wear surgical masks over his airways while exercising and failed to disclose that this involved the application of a medical device according to the FDA.

The defendant's "Covid" policy purportedly required plaintiff to be "vaccinated" but failed to disclose the fact that there were no FDA approved and commercially available vaccines.

The defendant's "Covid" policy failed to advise the plaintiff that the manufacturers of any these experimental vaccines disclaimed liability for their effectiveness and that they were indemnified by the United States government for any claims for adverse health consequences any of them might have caused.

The defendant's "Covid" policy failed to disclose that the so-called "vaccines" were in fact, not vaccines because, as admitted by the manufacturers, none of them prevented infection or transmission of any disease, specifically "Covid-19".

- 27 -

The defendant's "Covid" policy failed to disclose that the so-called "vaccines" were experimental, and failed to disclose any medical necessity for any of them, or the medical efficacy for any of them.

The defendant's "Covid" policy failed to include any provision for those with disabilities.

The defendant's "Covid" policy failed to consider or recognize any invitees with contra-indications to any provision of the policy.

The defendant's "Covid" policy failed to include any provision for those with contra-indications to any of its medical treatments. In fact, if an invitee attempted to express that he had a contra-indication, he was required to disclose his medical history and obtain a written statement from his physician. If he was able to obtain this written statement, the policy continued to subject him to its other medical treatments, or it was denied or ignored by the defendant altogether.

The policy set forth conditions for compliance and consequences or penalties for non-compliance, along with time periods by which invitees were required to comply or suffer the penalties, which included but were not limited to isolation, segregation, denial of services and denial of medical treatments. At one point, defendant even threatened the plaintiff with making a false police report for "trespass" removed from facility and membership revoked.

The defendant's "Covid" policy collected, stored, used and even created medical records regarding the plaintiff based upon information it had already obtained for other legitimate purposes, and based upon its own conclusions, such as plaintiff's refusal to answer the "vaccine status" question, and based upon other data that the defendant collected with or without the consent of the plaintiff, and with or without any business necessity, and regarding the collection, storage and use of such data, the defendant failed to implement a reasonable "data retention policy" to protect the data against a data breach, including but not limited to accepting financial responsibility or providing the plaintiff with a reasonable remedy therefrom.

The policy failed to meet or satisfy reasonable standards for the protection of plaintiff's medical information and was thereby negligent.

The policy failed to express or describe the manner in which the plaintiff's data was disclosed to any third party, including but not limited to government agencies, federally funded agencies such as those in the university system, or private organizations.

The policy failed to express or describe any process by which the plaintiff would be able to correct or remove her information once it was collected, stored and used by the defendant.

The policy failed to explain the business or other necessity for defendant's collection, storage and use of plaintiff's information.

The policy failed to include any meaningful or impartial oversight or dispute resolution or grievance procedure, or if it appears that there was such a procedure, the defendant refused to abide by the procedure, at least in good faith, or in any way.

At no time did the defendant attempt to obtain the consultation of any licensed health care professional regarding any one invitee, specifically the plaintiff, and the implementation of its "Covid" policy.

At no time did the defendant even attempt to obtain additional insurance to accept financial responsibility for protecting its employees, or the plaintiff, from the "spread of Covid-19".

At no time did the defendant even attempt to obtain additional insurance to accept financial responsibility for any invitee, or the plaintiff, suffering any adverse health consequences as a result of participating in or complying with its "Covid" policy.

While the defendant acted upon the unfounded presumption that first, there was such a deadly contagious disease and second, that every invitee suddenly became infected with it, the defendant adopted its "Covid" policy in the most negligent manner as plaintiff describes herein.

Furthermore, at no time did the defendant ever attempt to verify with the local department of health, the state department of health or the United States Department of Health, whether or not such deadly contagious disease was either proven to exist or proven to be contagious.  To this day, there is absolutely no evidence of either.

At no time did defendant rely upon any court orders obtained from the department of health that determined any of its invitees, specifically the plaintiff, to have such a disease.

Moreover, while the government proclaimed a public health emergency, there was never any evidence of such an emergency, and the respondent never obtained probable cause to legally impose any provisions of its negligent and *ad hoc* "Covid" policy.

The New Mexico Department of Health admits that it had and still has no documentary or scientific evidence (any culture or specimen) of any *bona fide* "Covid-19" contagious disease.  Contrary to Hollywood-style movies and Looney Tunes Cartoons, it is a scientific fact that viruses are not contagious pathogens in the first place.  The Hollywood portrayal of "viruses" is a fantasy.  Even with an histological or excretory specimen of any individual, there is no way to obtain valid test results establishing that the individual has or does not have any such disease as "Covid-19" for the simple reason that there is no sample by which the specimen can be compared.  This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation.

The official records of the medical examiner's office reveal that there was absolutely no cognizable change in either the morbidity or mortality rates for the year 2020; however, we can notice a significant increase in these rates following the practice of administering or unlawfully compelling people to take the experimental "vaccines" which have caused stroke, heart failure, neurological disorders, blood tissue clotting and related disorders, organ failure, sterility and death.  These were not the direct and proximate result of the so-called "virus" but the experimental medical treatments.  This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation.

The Department of Health did not receive one verifiable affidavit from any physician reporting any *bona fide* diagnosis of any certain individual having contracted "Covid-19". These are public records and can easily be verified but instead, everyone just accepts the fake news and what government officials blurt out in the news without any scrutiny.  This demonstrates that there is <u>no evidence</u> of any public health emergency, merely a naked proclamation based upon pure speculation and those making these false claims (your mayor, governor, respondent, employers etc.) are participating in disaster fraud, as they are rewarded by money from the disaster relief funds.

At no time did the Department of Health file any petition to obtain any detention order from the court. Failing to apply for a detention order denies anyone who is adversely affected by the so-called "Covid" policy the right to a be heard. If there was such a disease and if someone had been diagnosed with it, the Department of Health failed to fulfill its legal duty under the law. This demonstrates that there is no evidence of any public health emergency, but merely a naked proclamation based upon pure speculation. The fact that no such records exist again establishes that there is no evidence of any public health emergency.

Once again, we revisit the official public records of the Department of Health and discover that it has absolutely no documentary or scientific evidence, first of all that viruses are contagious pathogens, but more importantly, no evidence of the existence of the *ad hoc* "SarsCov2" or "Covid-19", whereby, no such specimen or culture has ever been isolated, purified and visualized by long-standing scientific standards. Once again, there is no evidence of any such public health emergency.

No single death certificate (public record) ever identified the so-called "Covid-19" as the single and certain cause of death; however, including the term in the actual certificate as a possible contributing cause ("co-morbidity") awarded the coroners and physicians huge sums of money. Once again, there is no evidence of any such public health emergency.

The announcement of public health emergency did not create any new legal authority or any new legal duty. Even if there were such an epidemic or pandemic, and even if the respondent's claim were proven to be true and correct, this fact alone did not suddenly give anyone, especially the defendant, any new legal authority, nor any new legal duty of care to compel laymen to impose the same exact medical treatment on everyone at the same time and without any diagnosis of any single individual, and without any judicial oversight or approval based upon a medical diagnosis that any one or more specific individuals within the "group", the entire city, had any such contagious disease.

Even if there were any single fiber of evidence that such a public health emergency did exist, the respondent did not thereby obtain any new legal authority, nor any new legal duty to act in the manner expressed in its related policies. Likewise, just because someone declared a public health emergency, even if it were true, this alone does not give anyone any

new legal authority or legal duty to violate the medical privacy rights of people in the community nor does it constitute any waiver of such rights.

Specifically, Health & Safety Code, Sections 121365 & 121367 sets forth the actual legal duties of physicians (not hospitals) and the local health officer, the summary of which includes:  upon receiving an affidavit from a licensed physician that reports a specific individual as having a deadly contagious disease, or that he has been exposed to a toxic substance, the local health officer, if unable to obtain the cooperation of the individual, can apply to the superior court for an order imposing certain medical treatments upon the individual and also imposing quarantine or isolation measures, but only under certain conditions and for only a limited time.

If then, by competent evidence following a *bona fide* evidentiary hearing, the individual is proven to be a direct threat to himself or others, the court may order such measures to be imposed upon him.  There has never been any cognizable authority for a mayor, or anyone from within the executive branch of government, to act as if everyone in the community had the same exact illness and then impose medical treatments upon everyone simultaneously, including forced medical examinations and compelling everyone to disclose his medical records for the purpose of policing such illegal policies.  There is absolutely no authority conferred upon the defendant to engage in this conduct itself.  The duties of the Department of Health cannot be delegated and were never delegated or assigned to the defendant.

There is no authority anywhere that permits the defendant to act upon the declaration that there is a public health emergency, such as a deadly contagious disease, by imposing experimental medical treatments and examinations upon everyone simultaneously without any evidence or diagnosis or due process.  This is clearly negligent.

At no time did the defendant make any meaningful effort to refrain from implementing its "Covid" policy, specifically upon receiving notice from the plaintiff that its policy was not related or necessary for any of the plaintiff's medical needs, did not fulfill any business necessity, and was not required by any law or court order, and was not based upon any *bona fide* medical diagnosis or risk of any kind.

At no time did the defendant attempt to verify the existence of any pandemic or epidemic; however, even if such condition did exist, it did not create any new legal duty for

the defendant to impose its "Covid" policy, nor did it create any new legal authority, nor did it waive the medical privacy rights, or the rights to informed consent, of the plaintiff or any employee, invitee or patient.

The defendant imposed unlawful and hazardous conditions upon the plaintiff for the use of its facilities.   These unlawful conditions include but are not limited to imposing experimental medical interventions, negligently administered by laymen, without any legal authority or duty, and without any physician's supervision and in violation of plaintiff's medical privacy rights and her rights informed consent.   Even though many employees of the defendant may have been doctors and nurses, those seeking to impose the "Covid" policy upon the plaintiff were not the doctors and nurses of the plaintiff, and therefore, laymen in their relation to the plaintiff.

The defendant imposed unlawful and hazardous conditions upon the plaintiff for the use of the facilities.   These unlawful conditions also include but are not limited to, involuntarily imposing experimental medical treatments on the plaintiff whereby, they were administered and imposed upon the plaintiff by laymen with no accountability or financial responsibility of any kind.

The defendant's "Covid" policy was purely speculative, irrational and unreasonable because it was based upon the outrageous and illogical notion that in order to prevent illness in one person, that another person needs to undertake a medical treatment.  This ridiculous notion has never existed at any time in human history, has never proven to have any medical necessity or efficacy, is not and never has been taught in medical school, and is pure quackery and, in this case, negligent.

While defendant's "Covid" policy created no new legal duty of care, this policy violated defendant's long-standing legal duties of care as alleged herein.  Specifically, the defendant violated its duty of care to provide a safe working environment by subjecting employees and invitees such as the plaintiff, to experimental medical interventions and acting outside of the scope of its charter which does not include practices reserved only to the department of health under the supervision of the court, and failing to prevent or intervene in matters involving on-the-job harassment and the foregoing allegations.

The defendant's "Covid" policy provoked and instigated conflict and confrontation between the defendant and the plaintiff and between the plaintiff and other personnel working on the premises.

The defendant's "Covid" policy created a poor and unsafe environment, not only for the plaintiff but for others with whom the plaintiff needed to coordinate to complete necessary tasks in the medical care she was seeking.

The defendant had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Especially considering the fact that the defendant was a hospital with doctors, nurses and other professionals who are expected to have a greater level of education regarding health and medicine and medical practices; and yet, proceeded to participate and implement the negligent policy without care or consideration or taking any efforts to scrutinize the necessity or effectiveness of the policy, even though it was written by unknown people. Since when would any physician accept the prescription of another physician without conducting his own diagnosis? Since when would or should any physician or health care professional impose a medical treatment that was written, not by another physician, but not a group of unknown people working for a corporation?

The defendant should not have imposed any provision of its "Covid" policy, at least for the following reasons:

a) The defendant's policy denied the plaintiff any opportunity for informed consent.

b) The defendant's policy denied plaintiff's attempt to have any meaningful debate or discussion on any of its provisions with the defendant or how these provisions may adversely affect the plaintiff.

c) The defendant's policy violated the plaintiff's rights to medical privacy.

d) The defendant's policy was not implemented because of any new law or any court order obtained by the department of health.

e) The defendant's policy was not based upon any *bona fide* medical examination by a physician that justified the medical necessity of the intervention.

f) The defendant failed to obtain establish any medical efficacy for the intervention.

g)  No provision of the defendant's "Covid" policy advised or disclosed to the plaintiff the nature or possibility of any hazard or risk associated with any of the treatments, interventions or experimental treatments.

h)  The defendant's "Covid" policy was hazardous and unsafe and not rooted or founded upon any scientific standards or *bona fide* medical advice pertaining to any single invitee, employee or individual, including but not limited to the plaintiff.

i)  The defendant's "Covid" policy was not based upon, and failed to describe, any business necessity for which the policy was needed; and, failed to describe any legitimate business necessity for which the policy was needed.

j)  The defendant's "Covid" policy, and the defendant generally, had no possible means to measure or test whether or not it did in fact "prevent the spread of Covid" as defendant claimed it was intended.

k)  The defendant's implementation of its "Covid" policy created the dangerous condition involving the involuntary imposition of experimental medical treatments without any judicial oversight or approval, without any physician's oversight, without any financial responsibility and in violation of plaintiff's medical privacy rights and rights to informed consent.

l)  The policy was arbitrary, irrational and unreasonable because it was based purely upon some Hollywood-style "pandemic" movie such as "Outbreak", and the implausible scenario that every invitee, patient and employee suddenly had become infected with the same exact deadly contagious disease within the same time period and that it was so deadly that it could be treated by people with absolutely no medical training, and without any *bona fide* medical diagnosis.

m)  The defendant's "Covid" policy demonstrated that it had no medical efficacy because it was based upon everyone participating for it to be effective, and purportedly required everyone to continue participating even after treatment.  This is the definition of a medical treatment having zero medical efficacy, yet the defendant proceeded to ignorantly and negligently impose it upon everyone including the plaintiff.

n)  The defendant's "Covid" policy was adopted and implemented by employees of the defendant who were each suffering from one or more un-diagnosed mental illnesses, such as those known as *factitious disorder*, and/or *narcissistic personality disorder* as each is defined in the <u>Diagnostic and Statistical Manual for Medical Health</u>, 5th Ed.[5]

The defendant allowed employees with these un-diagnosed mental illnesses to administer and manage its "Covid" policy.

The defendant failed to undertake any measures to treat those employees suffering from these mental illnesses, or to discover obvious symptoms for the purpose of assigning treatment within a reasonable time.

The defendant's policy neglects to consider the logical and rational question that, if there were such a deadly contagious disease, why would the defendant be permitted to involuntarily impose experimental medical treatments in the manner alleged?  Which is more dangerous, an implausible contagious disease that suddenly infects over three hundred million people, or layman administering experimental medical treatments based upon the same speculation without any medical diagnosis, patient consent, professional oversight or financial responsibility?  If it really did exist and if it were really so dangerous, why was the responsive policy so carelessly and negligently implemented?

The core of the policy itself was copied from the CDC's website, which disclaims all accuracy and liability for the provisions of the policy.

Just like shouting "fire" in a crowded theater, the defendant's "Covid" policy instilled fear, anxiety and apprehension in everyone as its facility, such that every time anyone had a cough or a symptom of the common cold, he believed he was not only going to die a horrible death but that he would infect other people with the same demise, and that he would "kill grandma".  This created a very hostile and antagonistic environment, especially between those who believed the defendant and those who either did not, or did not agree with the defendant's policy.

The defendant's "Covid" policy fails to address the screaming reality that neither the defendant, nor any scientific principles known to mankind at this time in history, has the ability

_____

[5]See also Factitious Disorder Imposed upon Another, Munchausen Syndrome and Megalomania.

to establish the proximate cause behind anyone becoming infected with the fictitious "Covid-19" disease.  The defendant's negligent "Covid" policy fails to address the very obvious situation where anyone, such as an employee ends his shift and leaves the premises and is free to roam about the town or travel to far away lands and engage with unknown and unidentifiable "risks" or "infected people", and then return to his job to begin her next shift. The same is true for visitors, patients and generally invitees, including the plaintiff.  It is by this fact alone that the defendant, no matter what its policies, is utterly incapable to "prevent the spread of Covid", by any stretch of the imagination, even if such a risk did exist.  How then is it reasonable or equitable to punish anyone, specifically the plaintiff, for refusing to participate in the policy?  The policy, even if based upon correct and actual scientific findings, is completely useless simply because the defendant cannot control anyone's environment every moment of the day, whether at work or away.

This condition (i.e. "Covid" policy) existed for such a length of time that the defendant did know and should have known of the condition in which it began implementing in June of 2020 and continues to this day.

The defendant created the condition of its own volition outside of any business necessity, legal duty, legal authority or even common sense, and it occurred with regularity and was therefore foreseeable.

Defendant had a duty to keep its property reasonably safe and protect the plaintiff from dangers of which it should have been aware, and to warn the plaintiff of any concealed dangers which should have been known to the defendant; however, defendant had no legal duty of care to involuntarily impose medical treatments, or especially experimental medical treatments, in the manner alleged.

As a direct and proximate cause of the defendant implementing its "Covid" policy, the plaintiff suffered the loss of multiple violation of rights, decrease in health and injury in the amount of $180,000 in costs beginning from July of 2020 and continuing to this day, along with pain, isolation, humiliation, defamation of plaintiff's good name, along with associated costs for interrupted medical care.  As a direct and proximate cause of defendant implementing its "Covid" policy, plaintiff suffered approximately $120.00 in financial losses.

The plaintiff suffered damages including but not limited to physical pain, unnecessary medical expenses that could have otherwise been avoided, emotional damages and other economic and non-economic damages.

The defendant failed to keep its property or premises in reasonably safe condition and to protect the plaintiff from dangers of which the defendant is or should have been aware; and failed to provide adequate notice or warning to the plaintiff of the likely adverse health affects that are consequential to any provision of its "Covid" policy. In fact, the defendant refused to discuss any aspects of its "Covid" policy with the plaintiff, including but not limited to her requests for defendant's legal duty and authority to impose it upon her, the medical necessity and efficacy of the policy, and for any legal basis that permitted the defendant to violate her medical privacy rights and rights to informed consent.

The defendant's "Covid" policy itself was a hazard and negligent.

The defendant is thereby responsible for the result of its willful acts (i.e. its "Covid" policy) and also for plaintiff's injuries occasioned and suffered by the plaintiff because of defendant's want of ordinary care or skill in the management of its property or person.

The defendant's "Covid" policy is preempted by state law and contravenes long-standing public policy regarding the health of well-being of people in the community. Public policy as it concerns health matters, and specifically *bona fide* or proven "epidemics" or "pandemics", requires a *bona fide* medical diagnosis by a physician's affidavit, and judicial oversight and approval upon actions of the department of health. This role cannot be delegated, nor was it ever delegated to any private business or other government agency, and specifically, it was never delegated to the defendant. The power to impose vaccinations is reserved to the law making authority of the state, while subject to judicial oversight and approval, and even the state cannot involuntarily impose experimental medical treatments without evidence and judicial oversight and approval.

The plaintiff has no other remedy at law against the defendant.

The defendant's conduct continues to this day and is expected to continue without cessation into the future as it continues to irrevocably injure the plaintiff and other employees.

To this day, the defendant believes that the false and unproven reports made in the news and by government agencies about the so-called "Covid-19" somehow gave it the legal duty and legal authority to act in the negligent manner alleged herein.  The defendant will parrot the false and unproven claim that the so-called "Covid pandemic" has killed millions of people, and then it will claim that the plaintiff is a "Covid denier"; however, <u>even if there were such a pandemic or even if there were such a disease</u>, <u>this is not a legal defense to negligence in this case</u>, and the defendant's acts and conduct were still negligent and the defendant still violated its many duties of care, none of which included imposing involuntary and experimental medical treatments upon anyone, including the plaintiff, and especially in the manner described by the plaintiff in this complaint.

It is thereby likely that the plaintiff would prevail on the merits of the complaint.

Plaintiff gives notice that he intends to seek punitive damages.

Plaintiff demands a jury trial.

WHEREFORE plaintiff demands judgment against the defendant for actual and compensatory damages in an amount exceeding one hundred and eighty thousand dollars ($180,000.00) plus costs, attorney fees and other relief as this court deems appropriate.

DATED this _12th_ day of July, 2023.

Todd Reed
Plaintiff in *propria persona*

- 39 -

Todd Reed, plaintiff in *propria persona*
9420 Las Calabazillas Rd NE
Albuquerque NM 87111
toddreed16@protonmail.com
(505) 604-8980

## UNITED STATES DISTRICT COURT
## OF NEW MEXICO
### 333 Lomas SW Albuquerque, NM 87102

TODD REED

     PLAINTIFF

v.                                                     CASE NO. _____

MIKAELA VARGAS, NEW MEXICO
SPORTS AND WELLNESS

     DEFENDANT

_____/

## AFFIDAVIT IN SUPPORT OF COMPLAINT

STATE OF NEW MEXICO    )
                        )    Ss
COUNTY OF BERNALILLO    )

1.    I, Todd Reed, do hereby solemnly affirm that the statements herein are true and correct in substance and in fact and that I have personal knowledge of each.

2.    I have been harassed at NMSW; discriminated and retaliated against on the basis of perceived disability.

3.    NMSW introduced new medical treatments, tests and inquiries as new conditions of employment.

4.    These new tests, treatments and inquiries were not designed to help me in my exercise routine, and were unrelated to performing my responsibilities as a member of NMSW..

5.    NMSW asked me to undertake various medical treatments, tests and inquiries because it perceived me as impaired and in need of treatment.

6.    I am absent and without evidence of any information from any health officer identifying myself as having any communicable disease or having been exposed to any toxic substance.

7.    I am absent and without knowledge of any evidence or court order, obtained by any petition of the Department of Health or a public health officer, that was based upon any

physician's affidavit in which I have been identified as having any communicable disease or having been exposed to any toxic substance.

8. I am absent and without knowledge of any evidence of any court order determining that I am or have been a direct threat to anyone.

9. I am absent and without knowledge of any evidence of any court order imposing any terms of isolation or quarantine or other measures upon myself.

10. I have previously and timely disclosed and duly noticed the defendant that I am regarded as having a disability and that the assertions made in the complaint are true and correct to the best of my knowledge, information and belief.

11. I understand that I have the right to make my own health choices and that no law has been suspended regarding my right to informed consent during this time and I have not been diagnosed with an infectious disease.

12. On July 13, 2021, plaintiff arrived at the entrance of defendant's NMSW on San Antonio building for his workout.

13. Plaintiff was prevented from exercising by Mikayla Vargus, acting for the defendant, who began harassing him, demanding he have his temperature taken, and that he wear a medical device over his face or else he will lose his membership, putting a thermometer on his forehead, and telling him he must wear a surgical mask as if that was supposed to prevent the spread of a hypothetical "deadly contagious disease" (disability).

14. Plaintiff explained that he had a very difficult time breathing with the surgical mask, and that demanding such an act violated his property rights.

15. Plaintiff was told there were no exceptions and per the NMSW COVID-19 policies, he would not be allowed in without complying with these conditions.

16. The so-called "Covid-19 policies" included nearly verbatim copies of those published by the Centers for Disease Control and Prevention, and the Department of Health, yet were not imposed upon anyone, including the plaintiff, by any court order or any law.

17. The defendant's policy failed to include any provision for those with disabilities, and failed to identify any employee or designated individual who was responsible for responding to complaints for violations of the Americans with Disabilities Act.

18. Plaintiff was forced to comply in order to exercise.

**19.**    When plaintiff was in the free weight room with MikaEla Vargas, he explained that  if he were to wear a mask, he would have a difficult time breathing.

**20.**    Ms. Vargas told him that while the mask was an inconvenience, it was for everyone's safety, yet she failed to describe the medical necessity or medical efficacy of wearing a surgical mask, and she failed to provide any information that would allow the plaintiff to become informed as to the medical necessity or efficacy of participating in such a medical intervention.

**21.**    When plaintiff walked to the H.I.T room after being coerced into wearing a medical device on his face he began to work on the heavy bag, plaintiff, blacked out and found himself on the floor.

**22.**    Plaintiff regained consciousness and a young lady was asking if he was O.K.?  Plaintiff looked around the H.I.T. rooms and saw there was a NMSW trainer as well as others staring at him.

**23.**    NMSW trainer did not aid Plaintiff.  Plaintiff left the facility feeling unstable and woozy but made it to his vehicle to regain his strength.

**24.**    Plaintiff called NMSW and explained what happened.  The attendant on the phone asked if plaintiff had completed a report.  Plaintiff explained that the phone call was the report.

**25.**    Plaintiff asked if he would be able to workout without a medical device or any other mitigated factors.   The attendant explained that nobody could enter facility without their temperature being taken, or wearing a medical device.

**26.**    Plaintiff asked if he had been listed as a direct threat.  The Attendant did not understand and had to talk to a manager.

**27.**    The NMSW attendant took a report and said that there was nothing he could do to make the NMSW allow plaintiff inside.

**28.**    Plaintiff arrived at the gym several days later and asked Aaron the manager to please tell him the law that he was breaking by not wearing a mask.  Aaron was unable to explain any laws the supported NMSW stance, but that it was there policy.

**29.**    Plaintiff asked Aaron, the manager, how is it legal to force people to follow an unlawful policy.  Aaron was unable to answer, and that he could only follow their gym policy.

**30.**    Plaintiff was not allowed to enter the gym and work out for the day.

**31.**    Plaintiff was forced to put membership on hold.

**32.**    Plaintiff called every 3 months to request access membership

**33.**    On June 1, 2021 Plaintiff sent a notice of discrimination and slip and fall

**34.**    On July 4, 2021 Plaintiff sent a notice of discrimination and application concerning the ADA.

**35.**    On August 23, 2021 Plaintiff called NMSW to find out if he could begin working out. Mikaela Vargas returned phone call and left a message explaining that she was going to revoke my membership.

**36.**    On August 23, 2021 Plaintiff sent a letter to NMSW Administrators and Mikaela Vargus stating Ms. Vargas discriminatory behavior.

**37.**    On September 1, 2021 a second notice of discrimination was sent to NMSW administration and Ms. Vargas and Aaron Lavender.

**38.**    On February 1, 2022 I was denied membership due to discrimination of being regarded as having a disability.

_____
Todd Reed, Affiant

STATE OF NEW MEXICO                )
                                                        ) Ss
COUNTY OF BERNALILLO        )

    Subscribed and Sworn to before me a notary public this 13th day of July, 2023.

_____
Signature of Notary

MARY GRACE A REYES
Notary Public - State of New Mexico
Commission # 1111569
My Comm. Expires Mar 2, 2027

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
TODD REED
9420 LAS CALABAZILLAS RD. NE

**(b)** County of Residence of First Listed Plaintiff **BERNALILLO**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS
NEW MEXICO SPORTS AND WELLNESS, WELLBRIDGE
MIKALA VARGAS

County of Residence of First Listed Defendant **BERNALILLO**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Ed Williams, President
6140 Greenwood Plaza Blvd

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [x] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [x] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 12101 Americans with Disabilities Act
Brief description of cause:
Violation of the ADA, Title III

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 180,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE July 13, 2023
SIGNATURE OF ATTORNEY OF RECORD
Todd Reed

**FOR OFFICE USE ONLY**

RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____

JS 44 Reverse (Rev. 04/21)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.